ROBERTSON, Justice:
This is a workmen’s compensation case. The attorney-referee and the full Workmen’s Compensation Commission found that there was no causal connection between the work activities of Lloyd Sidney Stewart and his fatal heart attack on the afternoon of December 17, 1969, while at his place of work, the University of Mississippi Medical Center.
The attorney-referee found, among other things: .
“(6) That the defendants presented the proof necessary to, and did, rebut and explain away the rebuttal (sic) presumption of causal relationship between the death of the deceased and his employment ;
“(7) That competent and substantial evidence established that the deceased suffered from an underlying pre-existing heart condition, probably coronary arteriosclerosis, which was the cause of his death on December 17, 1969, and that the fatal myocardial infarction was not the result of, caused by nor contributed to by the activities of his employment;”
The full Commission unanimously approved the findings and order of the attorney-referee. The Circuit Court of the First Judicial District of Hinds County, Mississippi, reversed the findings and order of the Commission, and held that the presumption of causal relationship between his fatal heart attack and his work activities had not been rebutted and overcome by the defendants.
Stewart was a jovial, happy-go-lucky type of fellow. He was a good plumber *826 and welder, and because of his competency in both lines of work, he had been made a foreman. He disliked the responsibility of being a foreman and making efficiency reports on workers under his supervision, and he threatened to quit. His supervisor, George C. Laird, suggested that he take about two weeks off, and then come back and they would talk it over. He came back to work on August 11, 1969, was relieved of his duties and responsibilities as a foreman and went to work just as a general plumber. He was happy and contented in his work, worked five days a week from 8:00 A.M. to 4:30 P.M., with y2 hour off for lunch. He was provided an assistant to carry his tools, and he carried only such small hand tools as could be put in a pouch on his belt.
On December 17, 1969, the day of his fatal heart attack, Laird testified that Stewart came to work as usual about 8 o’clock A.M., and that he probably saw Stewart two or three times during the morning, and that Stewart had no complaints. About 3 o’clock P.M., after Stewart had had a coffee break about 2:30, Mrs. Pam Logan, director of dietary services, called Mr. Laird. Laird testified:
“A. This was on December 17th, of course, and she was having a problem with her dish machine up there, dishwasher. She’s got a tremendous big dishwashing machine. Some parts she .felt needed to be replaced and she had a catalog of parts there but she couldn’t identify them and asked me to send somebody up there to identify these parts so she could get them on order.
And that s what you sent Mr. Stewart up there for ? ©
That’s right. f
Was he going up there to do any work? ¡Ó
A. No, he was just — that was his only mission that afternoon.”
Mrs. Logan testified that she had known Stewart since 1962. She continued:
“Of course, at first I asked him how he was and he said, fine, that he had seen his doctor the day before and he was feeling fine, and, of course, this was just —I hadn’t seen him in several days and I just talked to him a little and then we started on what he was there for, to go over the list that had been made for me. Some of the parts I was not sure I really needed and, with the budget that I have. I decided to go over these with him to see. The reason I asked for Mr. Stewart was because when I first came there Mr. Stewart was the Head Plumber, I guess, I really don’t know what his title was, but he was the one that I worked directly with and I felt he knew my situation better than anyone else. So I had requested that he go over the list that had been made for me.”
Mrs. Logan further testified that after about 15 or 20 minutes in her office going over the list, that Stewart was doubtful of the size of gauges that were on the list, and that Stewart said:
“[W]ell let me run out to the machine and I can just take a look at them and tell you whether these are the parts that you should order.”
Sarah Lee Curry who worked in the kitchen at the time, but who has since gone to Illinois to live, stated in her deposition that when Stewart came into the kitchen he spoke to her, said “Good evening” and smiled; that she spoke back to him and smiled at him. She then stated:
“He walked there at the back of the machine, and he was standing there looking at the machine, and then he walked kind of this way (indicating) and came on, like this, and I looked back to see then what was going on, and his eyes started watering bad — well, he went back like this, and his eyes started watering bad, and it looked like he tried to say something to me and couldn’t say noth *827 ing, and then he fell on back of the machine and started jerking. He was jerking all the way back, and his eyes was watering bad.”
Dr. John D. Bower, a specialist in internal medicine who worked with the kidney unit right across the hall from the kitchen, was called. He was asked what was Stewart’s condition when he first saw him, and he replied:
“A. Mr. Stewart was lying on his back, having fallen into that position, taking agonal respirations, approximately three (3) or four (4) breaths per minute, and was unconscious at the time that I saw him.”
Dr. Bower took immediate action, including mouth-to-mouth resuscitation and cardiac massage. He stated that he promptly yelled for the cardiac team, that it arrived in about five minutes and went into action, doing everything that could possibly be done to restore heart activity.
Dr. Perrin Berry, the family physician who had treated Stewart 2i/j years before for a serious heart attack, was called and arrived promptly at the hospital. Dr. Bower stated that when Stewart was moved to the surgical intensive care unit and after he had given Dr. Berry a report on what had happened, that Dr. Berry took over and assumed responsibility for his patient. Resuscitative efforts were continued for some time but to no avail.
Dr. Berry certified on the death certificate that the “immediate cause” of death was “acute myocardial infarction” and that it was “Due to, or as a consequence of: Arterioscleratic Heart Disease”.
Dr. Bower’s opinion, based on reasonable medical certainty, was that the cause of death was an acute myocardial infarction.
He testified positively and unequivocally that his work activity did not precipitate, aggravate or contribute to his fatal heart attack. He stated that his opinion was based not only on the background facts in the hypothetical question, but also on his personal observations made after he arrived on the scene and attempted to revive Stewart.
Dr. Joseph P. Melvin, cardiologist, was called as a rebuttal witness by the claimant. He stated that he had never examined nor even seen Stewart, but that, based on the hypothetical question alone, a person in Stewart’s condition should be in bed, and that practically any activity would contribute to a heart attack including driving a car.
On cross-examination, these questions were asked and these answers given :
“Q. . . . Doctor, if you have a person who is in a happy, jovial condition, is asymptomatic, and he simply walks in a radius of, say, fifty to sixty feet after having a rest period; and in the process of walking within this radius, he simply (snaps fingers) has a heart attack and dies as a result of it. Now that would be, you say, the classic situation where you would not have any causal relationship in that situation. Is that correct ?
“A. Any causal relationship _
“Q. To his activity?
“A. Probably not if the man, without any symptoms, suddenly drops dead. I fail to see any causal relationship it was anything except his underlying disease.”
The case at bar is somewhat analogous to McCarley v. Iuka Shirt Co., 258 So.2d 421 (Miss.1972). This Court said in McCarley:
“Several employees at the plant testified relative to the work activities of McCarley on the day in question, and their testimony showed without any material conflict that he was engaged in his usual work activity. In fact, when he was stricken he was using an ordinary *828 ten inch screw driver to adjust a buttonhole chute on a machine. There was nothing strenuous about the work he was doing or had done on this day.

“While our sympathy is with the appellant, the widow, we cannot say after a careful review of the evidence in this case that there was not substantial evidence from which the commission could find that the employer met the burden placed upon him to overcome the' presumption of causal connection.”
258 So.2d at 422.
In Hungerford v. Southern Shell Fish Company, 230 So.2d 59 (Miss.1969), we said:
“If we give full weight to the presumption that the deceased’s death was causally connected with his employment, the presumption must give way to the facts shown to the contrary. If we consider that the medical testimony for the claimant shows ‘probably this [his work] had something to do with his demise,’ still there is no testimony to show that the deceased workman ‘over-extended himself,’ and the medical opinion testimony for the defendant is to the contrary. The Workmen’s Compensation Commission determined from the whole evidence, including the presumption of causal connection, that ‘the deceased did not sustain a compensable injury or death within the scope of the Workmen’s Compensation Act.’
“We are of the opinion that the Commission had substantial evidence on which to base its order and that the circuit court was correct in sustaining the order of the Commission.” 230 So.2d at 60.
We reach the same conclusion. There was substantial evidence before the Commission on which it could base its order, finding that the employer had met the burden placed upon it of overcoming the presumption of causal connection, and denying and dismissing the claim for death benefits.
The circuit court was in error when, sitting as an appellate court, it reversed the order of the Workmen’s Compensation Commission, the fact-finding body, and held that the rebuttable presumption had not been overcome.
. The judgment of the circuit court is, therefore, reversed, and the order of the Workmen’s Compensation Commission reinstated.
Reversed and Order of Workmen’s Compensation Commission reinstated.
RODGERS, P. J., and PATTERSON, INZER, SMITH, SUGG and WALKER, JJ., concur.